**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IVAN SAMANIEGO,<br><br>            Plaintiff,<br><br>      v.<br><br>CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, et al.,<br><br>            Defendants. | Case No.: 1:21-cv-0839 JLT CDB<br><br>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS<br>(Doc. 33)<br><br>ORDER DIRECTING THE CLERK OF COURT TO UPDATE THE DOCKET AND TERMINATE SULLIVAN AND PFEIFFER AS DEFENDANTS IN THIS ACTION |

Ivan Samaniego asserts his civil rights were violated while he was incarcerated at the California Correctional Institution- Tehachapi. Samaniego contends he witnessed the assault of an inmate by CCI correctional officers and suffered retaliation for coming forward as a witness. He asserts the retaliatory acts continued after he was transferred to Kern Valley State Prison. Samaniego seeks to hold correctional officers liable for violating his rights under the First Amendment and Eighth Amendment. In addition, Samaniego seeks to hold W.J. Sullivan and Christian Pfeiffer, policymakers for CCI-Tehachapi and KVSP, liable for the First Amendment violations. (*See generally* Doc. 23.)

Defendants seek dismissal of claims in the Third Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, asserting Samaniego fails to allege facts sufficient to support his claims against Warden Sullivan, Warden Pfeiffer, and Officer Beardsley. (Doc. 32.) Samaniego opposes the motion, alleging the facts alleged are sufficient. (Doc. 36.) The Court found the matter

suitable for decision without oral argument, and the motion was taken under submission pursuant to Local Rule 230(g). (*See* Doc. 38.) For the reasons set forth below, Defendants' motion to dismiss is **GRANTED**.

I. **Background and Plaintiff's Allegations**[1]

Samaniego alleges that he "witnessed the unprovoked beating by several CCI Correctional Officers of fellow CCI inmate, Joe Nino, outside of Samaniego's cell" on December 31, 2018. (Doc. 32 at 8, ¶ 33.) According to Samaniego, "once [he] came forward as a witness to this particular assault against Nino, certain CCI Correctional Officers aggressively initiated a pattern of harassment, abuse and retaliation against Samaniego." (*Id.*) He alleges Officers Harris, Mumby, Perez, Luque, Gray, Zavaleta, Weiss, B. Jones, Cervantes, Castillo, Davis, Sgt. Escarcega, Presson, and Lt. Tyree "all knew that Samaniego was a witness to Harris' beating of inmate Nino and that he reported Harris' assault in an administrative 602 claim." (*Id.*)

Samaniego asserts he "was attacked and brutally beaten" by CCI Correctional Officers in several separate incidents on May 24, 2019. (Doc. 32 at 8, ¶ 34.) He alleges the first incident occurred at approximately 18:54 hours, at which time Officers Mumby, Perez, and Luque went to Samaniego's cell and were "talking trash about how they planned to fuck him up in his cell because of his reporting the assault by Harris." (*Id.* at 9, ¶ 35 [internal quotation marks, modifications omitted].) He contends the three officers opened the cell food port and pepper sprayed Samaniego through the port. (*Id.*) Samaniego asserts he used his foot to keep the cell door closed, and officers "eventually pried the cell door open after smashing Samaniego's left foot with this weapon and began spraying [him] once again." (*Id.* at 9-10, ¶ 35.) Samaniego alleges that while he was "pinned down by the officers' shields, Mumby, Perez, and Luque punched, kicked, and hit him with a baton. (*Id.* at 10, ¶ 35.) Samaniego asserts "these defendants were physically on top of [him]" when he was placed in handcuffs, and they "continued to beat him for approximately one minute before dragging him to the front of his cell and placing [him] in leg shackles." (*Id.*) Samaniego asserts "Mumby, Perez, Castillo, and Luque picked him up and body-slammed him to the floor." (*Id.*)

---

[1] The parties' names are emphasized in capital letters throughout the Third Amended Complaint. The Court omits this emphasis in summarizing and quoting the allegations.

2

1    Samaniego asserts a second incident occurred at approximately 19:30 hours when he was
2 escorted to the Day Room by Officers Gray, Zavaleta and Weiss. (Doc. 32 at 10, ¶ 36.) He alleges the
3 three officers dragged him "down the stairs holding him by the hand restraints (cuffs) and leg
4 shackles." (*Id.*) Samaniego contends Gray, Zavaleta and Weiss berated and cursed him for reporting
5 Harris and the beating of Nino. (*Id.*) Samaniego asserts "[t]hese defendants yelled… they were going
6 to 'fuck him up so all the other inmates can hear and fear them.'" (*Id.*) He asserts that upon arrival at
7 the Day Room, "Gray and Zavaleta body-slammed Samaniego on the floor, on his face and stomach,
8 then picked [him] up and dragged him to the rotunda, out of view of any other inmates and punched
9 and kicked Samaniego for about another minute before they dragged him to R & R (Receive and
10 Release area)." (*Id.* at 10-11, ¶ 36.)

11    According to Samaniego, a third incident occurred at approximately 19:40 hours at the R &R
12 holding cell area, when he was "again dropped on his face and stomach by Gray, Zavaleta, Mumby, and
13 Weiss." (Doc. 32 at 11, ¶ 37.) Samaniego alleges these defendants attacked him "by punching him in
14 the face, testicles, stomach and kicking him in the torso, rib area and back, while simultaneously
15 screaming at him: 'You fucked up, motherfucker, this is Tehachapi! You ain't going to make it out of
16 here!'" (*Id.*) He contends one of these four officers cut off his clothes after about a minute, "leaving
17 him in only his underwear." (*Id.*) Samaniego believes the officers "were extremely irritated and angry
18 that [he] had put on additional layers of clothing under his jumpsuit in anticipation of these defendants'
19 threats to do bodily harm and being beaten by the Correctional Officers." (*Id.*) Samaniego asserts:

> Weiss mounted Samaniego's back and said to him: "You like that motherfucker? You like men on top of you?" These defendants laughed, then one of them said: "Hold his ass good!" while one of these defendants thrust his knee on the left side of Samaniego's face, when he heard: "Did you mix it?" One of these defendants replied "Yes, I already mixed it." Weiss then got off Samaniego's back and he and the other defendants present held Samaniego's legs, body and arms and back while one of the defendants said "Pour some on the back of his head" before Samaniego began to feel a liquid substance trickle down the back of his neck onto his back. One of the defendants then said "Hold him stronger" and right when Samaniego felt a firmer grip on his body, the defendants began to undo and remove his boxer underwear and Samaniego felt a liquid substance on the middle of his buttocks and anal area. These particular defendants began to laugh as Samaniego's rectum was penetrated with an object, presumably a baton, with the liquid substance on it. This penetration of Samaniego's rectum with the object occurred four to six times….

(*Id.* at 12, ¶ 38.) Samaniego asserts that defendant "Presson, a CDCR Registered Nurse, witnessed the events," and failed to intercede to stop the actions and "failed to render any medical assistance or treatment to Samaniego at the scene or afterwards." (*Id.* at 13, ¶ 38.)

Samaniego contends a fourth incident occurred around 20:30 hours, at which time CDCR personnel that were present and witnessed his condition included: B. Jones, Cervantes, Sgt. Escarcega, Mumby, Weiss, Zavaleta, Gray, Harris, Davis, and Lt. Tyree. (Doc. 32 at 13-14, ¶ 39.) Samaniego asserts that while in Holding Cell #B, he "banged his head twice as a cry for help to get attention from the medical staff," but Presson still refused to attend to Samaniego, and the other defendants present became increasingly upset because the excessive injuries … were more extensive than expected." (*Id.*) He alleges Jones screamed at the others present, "then opened the food port and emptied his full OC spray on Samaniego out of frustration and to retaliate against him." (*Id.* at 14, ¶ 39.) Samaniego asserts after Jones sprayed him, "Cervantes emptied his full OC spray at Samaniego." (*Id.*) He maintains that while sprayed, he was "still in full body restraints" and "not a threat." (*Id.*) Samaniego alleges Weiss, Gray, Mumby, Zavaleta, and Harris entered the cell and "all attacked Samaniego, batting him with their shields, punching, kicking and hitting him with at least one baton, all while he was still fully restrained in arm and leg shackles." (*Id.*) Samaniego alleges he was "dragged … out of the holding tank," slammed to the floor, and "then dragged / carried to another nearby holding cell out of the view of others, including inmates, and surveillance cameras." (*Id.*)

Samaniego alleges the fifth incident occurred at approximately 20:55 hours on May 24, 2019. (Doc. 32 at 14, ¶ 40.) He alleges that in the new holding cell area, Gray, Zavaleta, Harris, and Mumby "continued to savagely beat and attack" him. (*Id.*) Samaniego asserts he was dropped on his stomach and face, and sprayed "over his body and face as Samaniego screamed for his life, that the named defendants were trying to kill him." (*Id.*) He contends at least one of the defendants "continued to spray and beat him with batons for approximately 60 seconds," before he was "dragged… out of the small tank area." (*Id.*) Samaniego alleges he was taken "in an area outside in the yard cages where they stopped attacking him and began to video-record Samaniego." (*Id.* at 14-15, ¶ 40.)

According to Samaniego, both during and after the identified incidents, "Presson refused to render any medical treatment to Samaniego for all of his bodily injuries and OC-pepper spray

4

decontamination, as required." (Doc. 32 at 15, ¶ 41.) He alleges Presson "failed in his duties to not only remedy medical aid but also to prevent the constant, repetitive assault, torture and rape of Samaniego, which he was witness to." (*Id.*) Similarly, Samaniego contends Tyree witnessed "all of the above-described assaults and torture," and "Tyree failed to intercede or otherwise take any corrective action to prevent … [the] attacks." (*Id.*, ¶ 42.) Samaniego asserts Presson and Tyree each "chose to join the conspiracy and cover up the wrongdoing of the named Correctional Officers, including preparation and submission of false reports." (*Id.*, ¶¶ 41, 42.)

Samaniego seeks to hold the correctional officers and nurse Presson liable for violations of his civil rights arising under the First and Eighth Amendments. (*See generally* Doc. 32 at 16- 28.) He asserts the attacks "resulted in a concussion, permanent eye socket damage and severe injuries and lacerations to [his] arms, legs, knees, face, organs, torso, neck and hands." (*Id.* at 17, ¶ 45.) Samaniego contends he also suffered "extreme emotional distress, fear, trauma, and humiliation." (*Id.*)

In addition, Samaniego seeks to hold the warden of CCI Tehachapi, defendant Sullivan, liable for the constitutional violations. (Doc. 32 at 18-19, ¶¶ 47-48; *id.* at 24, ¶ 60.) He contends, "Sullivan was responsible for the supervision, training and hiring of persons and employees working within CCI Tehachapi, including Correctional Officers, medical staff, mental health staff and other employees within the CCI facility." (*Id.* at 18, ¶ 47.) According to Samaniego, the claims against Sullivan "are based on his knowledge of the CDCR guidelines; and maintaining and permitting the practices, policies and customs under those guidelines and CDCR procedures for correctional facilities." (*Id.*) He alleges that "Sullivan was aware of the December 31, 2018 incident that Samaniego witnessed and provided a statement regarding the beating of CCI inmate Joe Nino, who filed a timely 602 claim." (*Id.*, ¶ 48.) Specifically, Samaniego asserts:

> Sullivan knew of this beating and of Samaniego's involvement as witness because part of Sullivan's job duties as CCI Warden is to review such claim forms for possible disciplinary actions that may be brought against CCI personnel. In particular, Sullivan knew about Harris' involvement in the Nino beating, that Harris was "written up" (via 602 claim) by Samaniego for this assault on Nino, and that Harris had numerous similar complaints filed against him for beatings and excessive force against other CCI inmates (including Andrew Hebert, CDCR #BC8228). Sullivan knew that Samaniego's involvement as a witness to the systemic excessive force and retaliation undertaken by CCI's rogue Correctional Officers, including, specifically, Harris, in the Nino attack, would undoubtedly "put a target" on Samaniego's back. Sullivan was directly aware of rogue, corrupt

5

> Correctional Officers at CCI that inflicted emotional trauma and sometime[s] severe physical beatings against CCI inmates in hopes of "silencing" them as witnesses to reveal or expose the criminal activities of the very guards who are sworn to uphold the law and maintain order and protect them in the prison system. This is precisely what happened here. By coming forward to expose the rogue guards, i.e., Harris, Samaniego risked his life. On information and belief, Defendant Sullivan ignored the target Harris placed on Samaniego's back and the clear danger to his personal, physical well-being, by condoning, encouraging, fostering and/or ratifying the unlawful conduct of said Defendants, specifically including the named Correctional Officer defendants involved in Incident Nos. 1 through 5….

(*Id.* at 18-19, ¶ 48, emphasis omitted.) Samaniego maintains "it is reasonably foreseeable that Sullivan knew or should have known that such a brutal retaliatory attack(s) against Samaniego would occur." (*Id.* at 24, ¶ 60.) Further, Samaniego believes Sullivan ratified the conduct of the defendants employed at CCI. (*Id.* at 19, ¶ 48.)

On July 19, 2019, Samaniego was transferred to Kern Valley State Prison. (Doc. 32 at 16, ¶ 43.) However, Samaniego contends he continues to suffer "retaliatory behavior" from officers at KVSP. (*Id.* at 7, ¶ 30; *see also id.* at 20, ¶ 49.) Samaniego alleges the warden of KVSP, defendant Pfeiffer, "had, or should have in his capacity as KVSP warden, actual knowledge of Samaniego's personal file and identification of Samaniego as a 'target' upon [his] transfer from CCI to KVSP in July 2019." (*Id.* at 20, ¶ 49.) According to Samaniego:

> Pfeiffer's awareness of Samaniego's personal file upon transfer to KVSP, including the severe beating that Samaniego sustained at CCI on May 24, 2019, provided sufficient notice to Pfeiffer of who, what and why Samaniego had become – and remained: a target of the corrupt, criminal CDCR Correctional Officers who run the daily CDCR activities, including those employed at KVSP. Also, on information and belief, Pfeiffer knew of the ongoing, widespread, constant beatings and use of excessive force by these corrupt Correctional Officers, who ruled the cell blocks and yards with intimidation, threats, and with brutal and violent attacks against defenseless inmates.

(*Id.* at 20-21, ¶ 50.) Samaniego reports he filed at least eight 602 complaints against KVSP officers for "physical intimidation, denial of medical care, theft of personal property and intentional placement… in non-segregated housing, purposefully placing his life in danger." (*Id.* at 21, ¶ 50.) He believes KVSP also officers "enlisted assistance of STG inmates to intimidate and harm [him]." (*Id.*) According to Samaniego, "instead of taking proper steps to discipline KVPS Correctional Officers," Pfeiffer condoned, encouraged, fostered and/or ratified "the unlawful conduct of said Defendants." (*Id.*, ¶ 51.)

6

Samaniego seeks to hold both wardens Sullivan and Pfeiffer liable "for [their] own culpable action or inaction in the training, supervision or control of his subordinates, or for his acquiescence in the constitutional deprivations which [the] Third Amended Complaint allege, or for the conduct that showed a reckless or callous indifference to the rights of others, including Samaniego." (Doc. 32 at 19, ¶ 48; *see also id.* at 21, ¶ 51.)

On May 24, 2021, Samaniego initiated this action by filing a complaint for violations of his civil rights (Doc. 1), which he amended on November 29, 2021 (Doc. 12). Defendants Sullivan and Pfeiffer moved to dismiss the claims against them, and the motion was granted. (Docs. 14, 22.) To the extent the claims were raised against the wardens in their official capacity, the Court dismissed the claims without leave to amend. (*Id.* at 9.) However, the Court granted leave to amend to the extent the claims were raised against the wardens in their individual capacities. (*Id.* at 8.) Defendants also challenged the sufficiency of the allegations in the Second Amended Complaint, and the Court granted the motion to dismiss. (Docs. 26, 31.) In granting leave to amend, the Court informed Samaniego that he would be given "one final opportunity to allege facts sufficient to support his claims against Sullivan and Pfeiffer." (Doc. 31 at 21, emphasis omitted.)

Samaniego filed his Third Amended Complaint on August 8, 2022. (Doc. 33.) Defendants Sullivan, Pfeiffer, and Beardsley filed the motion to dismiss all claims against them on August 8, 2022. (Doc. 33.) Samaniego filed his opposition to the motion on August 22, 2022 (Doc. 36), to which the defendants replied on August 31, 2022 (Doc. 37).

**II.     Legal Standards for a Motion to Dismiss**

A Rule 12(b)(6) motion "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal of a claim under Rule 12(b)(6) is appropriate when "the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). Thus, under Rule 12(b)(6), "review is limited to the complaint alone." *Cervantes v. City of San Diego*, 5 F.3d 1273, 1274 (9th Cir. 1993).

The Supreme Court held: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The

Supreme Court explained,

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal*, 556 U.S. at 678 (internal citations omitted). Allegations of a complaint must be accepted as true when the Court considers a motion to dismiss. *Hospital Bldg. Co. v. Rex Hospital Trustees*, 425 U.S. 738, 740 (1976). A court must construe the pleading in the light most favorable to the plaintiff, and resolve all doubts in favor of the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). However, legal conclusions need not be taken as true when "cast in the form of factual allegations." *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir. 2003).

"The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). The Court "will dismiss any claim that, even when construed in the light most favorable to plaintiff, fails to plead sufficiently all required elements of a cause of action." *Student Loan Marketing Assoc. v. Hanes*, 181 F.R.D. 629, 634 (S.D. Cal. 1998). To the extent pleading deficiencies can be cured by the plaintiff alleging additional facts, leave to amend should be granted. *Cook, Perkiss & Liehe, Inc. v. Northern Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

**III.     Section 1983 Claims**

An individual may bring an action for the deprivation of civil rights pursuant to 42 U.S.C. § 1983 ("Section 1983"), which "is a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). In relevant part, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C. § 1983. To state a cognizable claim under Section 1983, a plaintiff must allege (1) the

deprivation of a constitutional right and (2) a person who committed the alleged violation acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Williams v. Gorton*, 529 F.2d 668, 670 (9th Cir. 1976).

A plaintiff must allege a specific injury was suffered and show causal relationship between the defendants' conduct and the injury suffered. *See Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976). Thus, Section 1983 "requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by the plaintiff." *Chavira v. Ruth*, 2012 WL 1328636, at *2 (E.D. Cal. Apr. 17, 2012). A person deprives another of a constitutional right "if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do so that it causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

## IV.     Discussion and Analysis

Defendants seek dismissal of the claims against Beardsley, Sullivan, and Pfeiffer, asserting the facts alleged are insufficient to state a cognizable claim against these defendants. (Doc. 33 at 1.) In addition, Defendants contend "Sullivan and Pfeiffer are entitled to qualified immunity for any claims asserted against them." (*Id.*) Samaniego maintains dismissal is not appropriate, and his allegations—as stated in the TAC and opposition— are sufficient to support his claims. (*See* Doc. 36 at 5-12.)

### A.     Liability of Officer Beardsley

Samaniego names Officer Beardsley as a defendant in the caption of the TAC and alleges Beardsley "is an individual and believed to be a resident of the County of Kern, California during all times relevant hereto." (Doc. 32 at 3-4, ¶ 11.) However, there are no other allegations in the TAC related to Beardsley. (*See generally* Doc. 32.) Thus, Defendants contend Beardsley should be dismissed as a defendant. (Doc. 33 at 10.)

Under Section 1983, a plaintiff must allege that each defendant personally participated in the deprivation of his rights. *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). The facts alleged must be sufficient for the Court to conclude that each defendant, through his own individual actions, violated Samaniego's constitutional rights. *Iqbal*, 556 U.S. at 1948-49. Samaniego acknowledges that he failed to identify any actions taken by Beardsley in the TAC. (Doc. 36 at 12.) Opposing dismissal,

Samaniego asserts:

> Beardsley was employed and positioned as a tower guard at the CCI facility and was a witness to the maneuverings of the defendant correctional officers who participated in the physical beating of Samaniego on May 24, 2019, and similar to the other named correctional officers, failed to intervene or otherwise come forward to stop the constitutional violations committed against Plaintiff, or to report such illegal conduct witnessed to his superiors on Plaintiff's behalf.

(Doc. 36 at 12.) According to Samaniego, the omission in the body of the TAC of these allegations "was inadvertent." (*Id.*)

Significantly, the Court may not look to the allegations regarding Beardsley raised by Samaniego in his opposition to determine the viability of the claims. *See Schneider v. Cal. Dep't of Corrections,* 151 F.3d 1194, 1197 n. 1 (9th Cir.1998) (finding "new allegations" raised in an opposition to a motion to dismiss were "irrelevant for Rule 12(b)(6) purposes," because "[i]n determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss") (emphasis in original); *see also Campos v. Fresno Deputy Sheriff's Assoc.* 441 F. Supp. 3d 945, 959 (E.D. Cal. 2020) ("A court may not look beyond the complaint to a plaintiff's memorandum in opposition to a defendant's motion to dismiss."). Thus, the Court declines to cure the admitted pleading deficiency based solely upon allegations in the opposition, and Defendants' motion to dismiss Beardsley as a defendant is **GRANTED**, with leave to amend.[2]

### B. Liability of the Wardens

Liability may not be imposed on supervisory personnel under Section 1983 based on the theory of *respondeat superior*, as each defendant is only liable for his or her own misconduct. *Iqbal*, 556 U.S. at 1948-49; *Ewing v. City of Stockton*, 588 F.3d 1218, 1235 (9th Cir. 2009). When a defendant holds a supervisory position—such as Wardens Sullivan and Pfeiffer—the causal link between such defendant and the claimed constitutional violation must be specifically alleged. *See Fayle v. Stapley*,

---

[2] This Court previously observed that "[f]acts raised for the first time in opposition papers should be considered … in determining whether to grant leave to amend or to dismiss the complaint with or without prejudice." *Campos*, 441 F. Supp. 3d at 959 (citing *Broam v. Bogan,* 320 F.3d 1023, 1026 n.2 (9th Cir. 2003).) Based upon the allegations presented in the opposition, the Court finds leave to amend is appropriate for Samaniego to incorporate the allegations into his complaint and clarify the claim(s) for which he seeks to impose liability against Beardsley.

10

607 F.2d 858, 862 (9th Cir. 1979); *Mosher v. Saalfeld*, 589 F.2d 438, 441 (9th Cir. 1978).

Samaniego must allege facts sufficient to determine that Sullivan and Pfeiffer "participated in or directed the violations, or knew of the violations and failed to act to prevent them." *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *accord Starr v. Baca,* 633 F.3d 1191, 1209 (9th Cir. 2011); *see also Anderson v. Hansen*, 2013 WL 4676212 at *3 (E.D. Cal. Aug. 30, 2013) ("[a] prison official may be held liable for failing to protect an inmate from a prison guard if he knew of an excessive risk to inmate health or safety posed by the … prison guard and disregarded that risk"). Claims that "rely upon claims of the general responsibility of the warden for prison operations that are insufficient to establish Section 1983 liability." *Brown v. Perez*, 2016 WL 7975264 at *6 (C.D. Cal. Dec. 16, 2016).

1. Addressing individual capacity at the pleading stage

Samaniego maintains that "at the pleading stage," he "is not required to identify the specific superficial 'individual capacity' of either defendant warden." (Doc. 26 at 4.) According to Samaniego, capacity "is a question of fact requiring discovery, and is, thus, an inappropriate basis for dismissal at the pleading stage." (*Id.*, citing *Gurrola v. Jervis*, 2009 U.S. Dist. LEXIS 133234 at *24, 2009 WL 9548218 (C.D. Cal. April 2, 2009).) Samaniego contends in *Gurrola,* the court indicated the "capacity in which the employee or agent is acting in a such a role is a question of fact to be addressed at the summary judgment stage." *Id.*

As the Court previously explained—when addressing same argument related to the SAC— the Central District did not address a claim arising under Section 1983 in *Gurrola*. Rather, the court addressed the doctrine of *respondeat superior* under California Law, including the Fair Housing Act, the Unruh Civil Rights Act, and Fair Employment and Housing Act. *Gurrola*, 2009 WL 9548218 at *6, *9-10 (observing "[t]here is no question that principles of *respondeat superior* apply in the Fair Housing Act context;" "*[r]espondeat superior* does appear to be an applicable liability theory, at least with respect to Plaintiffs' Unruh Civil Rights Act claim;" and the doctrine was "plainly applicable in the FEHA context"). The court then indicated that whether an individual acted within the scope of his employment for purposes of invoking liability under the doctrine of *respondeat superior* appeared "to be a fact question better left for the summary judgment stage []at which time the parties can also address whether the traditional 'scope of employment' analysis applies." *Id.* at *10.

11

In contrast to the laws addressed in *Gurrola*, the doctrine of *respondeat superior* does not apply under Section 1983. *Iqbal,* 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*"); *see also Snow v. McDaniel,* 681 F.3d 978, 985 (9th Cir. 2012) ("Under Section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability"); *Jesus Christ Prison Ministry v. Cal. Dep't of Corr.*, 456 F.Supp.2d 1188, 1196 (E.D. Cal. 2006) ("Supervisory personnel … are not liable under § 1983 for the actions of their employees under a theory of *respondeat superior*"). Because the doctrine of *respondeat superior* is inapplicable under Section 1983, Samaniego is unable to hold Wardens Sullivan and Pfeiffer liable for the actions of correctional officers at the prisons by invoking the doctrine. As a result, his continued reliance upon *Gurrola* is misplaced.

Moreover, contrary to Samaniego's assertion, courts may clearly address the capacity of defendants "at the pleading stage" when evaluating a claim under Section 1983 and determine whether the pleadings are sufficient to invoke liability for supervisory officials. *See, e.g.*, *Lee v. City of Los Angeles*, 250 F.3d 668, 697 n.6 (9th Cir. 2001) ("when plaintiffs sue public officials in their individual capacity under § 1983, [] to survive a Rule 12(b)(6) motion to dismiss, plaintiffs must state in their complaint nonconclusory allegations…" [citation omitted]); *Parker v. Landry*, 935 F.3d 9, 14-19 (1st Cir. 2019) (addressing whether the allegations at the pleading stage were sufficient to invoke liability upon the supervisory personnel, in their individual capacities, and finding the district court properly denied a motion to amend the complaint as futile); *Lex v. Wexford Health Source*, 2016 WL 302151, at *2 (N.D. Ill. Jan. 25, 2016) ("Section 1983 claims for monetary damages against state officials in their official capacity cannot survive the pleading stage because those state officials are not 'persons' for purposes of allowing suit under Section 1983").

        2.      Claim against Sullivan

Samaniego reports his "claims against Defendant Sullivan are based on his knowledge of the CDCR guidelines; and maintaining and permitting the practices, policies and customs under those guidelines and CDCR procedures for correctional facilities." (Doc. 32 at 18, ¶ 47.) He asserts that "because part of Sullivan's job duties as the CCI Warden was to review [602] claim forms for possible disciplinary actions that may be brought against CCI personnel …, Sullivan knew about Harris'

12

involvement in the Nino beating, that Harris was 'written up' (via 602 claim) Samaniego for this assault on Nino, and that Harris had numerous similar complaints filed against him for beatings and excessive force against other CCI inmates (including Andrew Hebert, CDCR #BC8228)." (*Id.*, ¶ 48.) In addition, he contends Sullivan knew that reporting Harris "would undoubtedly 'put a target' on Samaniego's back." (*Id.* at 19, ¶ 48.) According to Samaniego: "On information and belief, Defendant Sullivan ignored the target Harris placed on Samaniego's back and the clear danger to his personal, physical well-being, by condoning, encouraging, fostering and/or ratifying the unlawful conduct of said Defendants, specifically including the named Correctional Officer defendants involved in Incident Nos. 1 through 5." (*Id.*) Further, Samaniego alleges Sullivan ratified the conduct of the defendants. (*Id.*)

       Defendants contend these allegations in the TAC remain insufficient to invoke the individual liability of Sullivan. (Doc. 33 at 6.) Defendants observe: "[t]he TAC does not allege that Defendants Sullivan and Pfeiffer knew in advance of the alleged attack on Plaintiff, or that they were involved in it." (*Id.*) According to Defendants, Samaniego "affirmative acknowledges" that Sullivan "did not have such prior knowledge or involvement" and instead Samaniego based the knowledge of Sullivan upon his responsibility of "being in change of the prison and its staff, and with knowledge of the other inmate's prior beating for which Plaintiff made a witness statement." (*Id.*, citing TAC ¶¶ 47-49.) Defendants argue "These allegations are essentially the same as those in the prior second amended complaint, which the Court found insufficient in granting Defendants' prior motion to dismiss." (*Id.*) Defendants acknowledge Samaniego has now identified Harris as the officer involved in the attack on Nino but contend "the SAC had alleged the same 'target' allegations, just without identifying the person who allegedly beat the other inmate as being Harris." (*Id.*) Because the Court previously found "the alleged target scenario… was insufficient to state a claim," Defendants contend the allegations continue to be insufficient. (*Id.*)

       Samaniego contends he "sufficiently alleged Sullivan's culpability, and directs the Court's attention to paragraphs 47 and 48 in the TAC. (Doc. 36 at 7.) He asserts the allegations in the TAC support a conclusion that Sullivan exhibited "deliberate indifference towards Samaniego's safety and well-being." (*Id.*) According to Samaniego, his "allegations demonstrate that the requisite causal connection was established by setting in motion a series of acts by or by Sullivan's knowingly refusing

13

to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." (*Id.*, citing *See Starr v. Baca,* 652 F.3d 1202, 1207-08 (9th Cir. 2011) (modifications adopted, emphasis omitted). Samaniego maintains that he "[n]aturally … does not plead 'advance knowledge' by the wardens" because "[t]hat is what discovery is for." (*Id.*)

Significantly, Samaniego's contention that he is not required to plead knowledge at this juncture is directly contrary to established pleading standards. As explained by the Ninth Circuit, "Even under a 'deliberate indifference' theory of individual liability, [a plaintiff] must still allege sufficient facts to plausibly establish the defendant's 'knowledge of' and 'acquiescence in' the unconstitutional conduct of his subordinates." *Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012) (citing *Starr*, 652 F.3d at 1206-07); *see also Chavez v. United States*, 683 F.3d 1102, 1111 (9th Cir. 2012) (finding "no factual basis for imputing any such knowledge" of constitutional violations to supervisors "by virtue of [their] responsibilities"); *Martinez v. Sherman*, 2022 WL 126054, at *4 (E.D. Cal. Jan. 12, 2022) (finding allegations were insufficient to state a claim against a warden where the complaint was "devoid of any factual allegations that would demonstrate… knowledge," as required for deliberate indifference). Thus, to hold Sullivan liable under a deliberate indifference theory, Samaniego is required to allege Sullivan had knowledge of and acquiesced to the conduct of his subordinate officers. *See Hydrick*, 669 F.3d at 942; *Starr*, 652 F.3d at 1206-1207.

For example, the Ninth Circuit determined in *Starr* that a plaintiff stated a cognizable claim against a supervisor where he alleged that the sheriff knew of — and was specifically given official notice of — culpable uses of force by subordinates prior to the alleged use of excessive force against the plaintiff and took no preventative action. *Starr*, 652 F.3d at 1208-1209. The Court observed there were "many allegations in the complaint detailing what Sheriff Baca knew or should have known, and what Sheriff Baca did or failed to do." *Id.* at 1209. Starr alleged Baca signed a Memorandum of Understanding in 1999, which required him "to address and correct the continuous constitutional violations to which inmates were being subjected." *Id.* Starr also detailed numerous instances of injuries to other named inmates that occurred after Baca signed the Memorandum of Understanding. *Id.* at 1209-1212. The Court noted Barr also received notice of all incidents, and Starr alleged "Baca

14

did not take action to protect inmates under his care despite the dangers, created by the actions of his subordinates, of which he had been made aware." *Id.* at 1216. The Court concluded the allegations "plausibly suggest that Sheriff Baca acquiesced in the unconstitutional conduct of his subordinates, and was thereby deliberately indifferent to the danger posed to Starr." *Id.* at 1216. Thus, the Court concluded Starr "sufficiently alleged under Rule 8(a) a supervisory liability claim of deliberate indifference against Sheriff Baca." *Id.* at 1217.

On the other hand, a general assertion that a supervisor knew of "systemic excessive force" by officers fails to support a claim. For example, the Central District determined a plaintiff failed to state a claim against three associate wardens when the plaintiff asserted the wardens "knew of the 'systemic acts of excessive force on inmates' by the Green Wall prison officials and condoned them." *Windham v. Franklin*, 2014 WL 7740262, at *14 (C.D. Cal. Aug. 29, 2014). The court explained, "Plaintiff's allegations that [the associate wardens] knew that prison officials used excessive force against inmates are too conclusory to constitute a basis for holding them personally liable for the force used against Plaintiff." *Id.*

Similarly, the Southern District found in *Johnson v. Paramo* that the plaintiff failed to state a claim against a warden where the facts alleged did not allege facts sufficient to support a conclusion that the warden knew of a risk of harm to the plaintiff. *Id.*, 2018 WL 571957 (S.D. Cal. Jan. 26, 2018). Jackson asserted that "Paramo should have known that [he] would be injured or attacked if required to [housing in] Facility C because Warden Paramo knew about the inappropriate behavior of Defendants … from Plaintiff's interview about the behavior, completed 602 appeal forms, and complaints lodged with the Internal Affairs Office." *Id.* at *8. However, the court observed: "the fact that Plaintiff filed complaints does not establish that (1) Defendant Paramo read the complaints, (2) the information in the complaints was an accurate account of what occurred, or (3) Defendant Paramo knew that housing Plaintiff in Facility C would create an excessive risk to Plaintiff's health or safety." *Id.* The court explained that even if the warden "suspected that there was a possibility of a problem occurring if Plaintiff was housed in Facility C, theoretical risk of harm is insufficient to establish deliberate indifference." *Id.* (citing *Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987); *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986)). Furthermore, although Jackson argued "Paramo is liable for his 'own

15

1  culpable action or inaction in the training, supervision, or control of his subordinates, for his
2  acquiescence in the constitutional deprivation,'" the court found Jackson failed to identify "any specific
3  training or supervision by Defendant Paramo that indicated an acquiescence in the alleged
4  constitutional deprivation." *Id.* As a result, the court finds the allegations were insufficient to establish
5  any causal link between Paramo and any alleged constitutional violation and dismissed the claim. *Id.* at
6  *9, *adopted by* 2018 WL 1531927, at *1 (S.D. Cal. Mar. 28, 2018).

7  Significantly, as Defendants argue, Samaniego has not added any allegations in the TAC that
8  support a conclusion Sullivan knew of a risk to Sullivan and disregarded the risk. Once again,
9  Samaniego alleges Sullivan knew of "rogue, corrupt Correctional Officers at CCI" and that officers
10 "inflicted emotional trauma and sometime severe physical beatings against CCI inmates in hopes of
11 'silencing' them as witnesses to reveal or expose the criminal activities of the very guards who are
12 sworn to uphold the law and maintain order and protect them in the prison system." (Doc. 32 at 19, ¶
13 48.) However, Samaniego does not allege facts—beyond conclusions he makes due to Sullivan's job
14 duty to review 602 forms—that show Sullivan knew of a risk *to Samaniego*. As in *Jackson*, the fact
15 that Samaniego submitted a 602 implicating wrongful conduct by Harris against another prisoner does
16 not establish that Sullivan read the 602 or knew Harris would target Samaniego months later. *See id.*,
17 2018 WL 571957, at *8. For example, Samaniego does not identify other specific incidents in which a
18 prisoner submitted a 602 claim and suffered retaliatory actions by Harris or the other named
19 defendants as a result, such that Sullivan would be aware of a pending threat to Samaniego.[3] *Compare*
20 *with Starr*, 652 F.3d at 1208-1209. Indeed, deliberate indifference requires showing of "more than a
21 mere suspicion that an attack will occur." *Berg*, 794 F.2d at 459; *see also Gaut*, 810 F.2d at 925
22 ("mere threat" of possible harm does not violate the Eighth Amendment). Further, Samaniego does
23 not allege facts supporting his conclusion that Sullivan ratified the conduct of the subordinate officers.
24 Without such allegations, Samaniego again fails to support his conclusion that the CCI warden was
25 aware of a risk of retaliatory actions, including excessive force, for Samaniego self-identifying as a

---

[3] Samaniego alleges that other inmates filed excessive force complaints against Harris, including Andrew Hebert, CDCR #BC8228. (Doc. 32, ¶ 48.) However, there are no facts alleged related to the other complaints—including that of Herbert—such as the alleged excessive force being in retaliation for complaints against Harris or other officers.

witness in Nino's alleged attack. *See Windham*, 2014 WL 7740262, at *14.

      c.  Claim against Pfeiffer

    Samaniego reports his "claims against Defendant Pfeiffer are based on his maintaining and permitting the practices, policies and customs under CDCR guidelines and procedures for correctional facilities." (Doc. 32 at 20, ¶ 49.) Samaniego acknowledges that "Pfeiffer was not responsible for [the] May 24, 2019 beating at CCI." (*Id.*) However, Samaniego alleges Pfeiffer "had, or should have in his capacity as KVSP warden, actual knowledge of Samaniego's personal file and identification of Samaniego as a 'target' upon Samaniego's transfer from CCI to KVSP in July 2019." (*Id.*) He reports he filed at least eight 602 complaints against KVSP officers for "physical intimidation, denial of medical care, theft of personal property and intentional placement … in non-segregated housing, purposefully placing his life in danger." (*Id.* at 21, ¶ 50.) Samaniego also believes KVSP officers "enlisted assistance of STG inmates to intimidate and harm [him]." (*Id.*) According to Samaniego, "instead of taking proper steps to discipline KVPS Correctional Officers," Pfeiffer condoned, encouraged, fostered and/or ratified "the unlawful conduct of said Defendants." (*Id.*, ¶ 51.)

    Importantly, as Samaniego acknowledges, all other defendants in this action were employed at CCI, not KVSP, and were not under the supervision of Warden Pfeiffer. Thus, it strains credulity that "Pfeiffer has continued to condone, encourage, foster and/or ratify the conduct of *[the] Defendants*." (Doc. 32 at 21, ¶ 51 (emphasis added).) Furthermore, there are no facts alleged to support this assertion. To the extent Samaniego contends Pfeiffer knew of a risk to Samaniego and disregarded it, resulting in violations of his civil rights at KSVP, the Court is also unable to find the allegations in the TAC support such a conclusion. For example, there are no allegations that the correctional officers at KSVP who committed the acts complained of knew that Samaniego was identified as a witness in a 602 claim submitted at CCI. Without such knowledge, the acts could not be "retaliatory," and supervisor liability cannot be imposed upon Pfeiffer for a violation of the First Amendment. *See Windham*, 2014 WL 7740262, at *14 ("allegations that [the associate wardens] knew that prison officials used excessive force against inmates are too conclusory to constitute a basis for holding them personally liable for the force used against Plaintiff"); *Flynn v. City of Santa Clara,* 388 F.Supp.3d at 1164-65 (N.D. Cal. 2019) (dismissing claims where there were no allegations officers were aware of the plaintiff's protected First

Amendment activity); *Hammler v. Alvarez*, 2019 WL 422575, at *9 (S.D. Cal. Feb. 4, 2019) ("Because Plaintiff alleges no facts to show that [defendant] had any prior knowledge of this grievance, there are no facts to suggest that [the officer] issued the RVR *in retaliation*…") (emphasis added).

### 3. Qualified immunity

Defendants contend, "If for any reason the Court determines that Plaintiff has stated a cognizable claim against Defendants Pfeiffer or Sullivan, they are entitled to qualified immunity." (Doc. 33 at 7.) Because the Court finds Samaniego did not allege facts sufficient to impose supervisor liability, as set forth above, the Court declines to address the matter of qualified immunity.

## V. Leave to Amend

Samaniego requests leave to amend if dismissal is granted. (Doc. 36 at 12.) Pursuant to Rule 15 of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (alterations, internal quotation marks omitted). When dismissing a claim, "a district court should grant leave to amend … unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Id*. at 1130 (internal quotation marks omitted). Generally, leave to amend shall be denied only if amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publishing*, 512 F.3d 522, 532 (9th Cir. 2008).

Given the lack of allegations in the TAC related to Officer Beardsley, the Court is unable to determine whether amendment would be futile. Therefore, leave to amend the claims against Officer Beardsley is appropriate, because it would allow Samaniego to clarify the actions attributed to the officer and the basis for his claims.

On the other hand, Samaniego was previously granted leave to amend the claims against Sullivan and Pfeiffer. (*See* Doc. 22 at 9; Doc. 31 at 21.) Samaniego has again failed to allege facts sufficient to cure the pleading deficiencies identified by the Court. As a result, further leave to amend the claims against Sullivan and Pfeiffer is futile. *See, e.g.*, *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 1008 (9th Cir. 2009) ("repeated failure to cure deficiencies" constitutes "a strong indication

18

that the [plaintiff] has no additional facts to plead" and "that any attempt to amend would be futile"). Accordingly, the request for leave to amend the claims against Sullivan and Pfeiffer is denied.

## VI. Conclusion and Order

Based upon the foregoing, the Court **ORDERS**:

1. Defendants' motion to dismiss (Doc. 33) is **GRANTED**.
2. Officer Beardsley is **DISMISSED** as a defendant, with leave to amend.
3. The claims against Wardens Sullivan and Pfeiffer are **DISMISSED** without leave to amend.
4. The Clerk of Court is directed to update the docket and terminate W.J. Sullivan and Christian Pfeiffer as defendants in this action.
5. Plaintiff **SHALL** file any Fourth Amended Complaint within 45 days of the date of service of this order.

**Failure to file the amended complaint as ordered will result in Officer Beardsley being terminated as a defendant in this action.**

IT IS SO ORDERED.

Dated: **February 27, 2023**

UNITED STATES DISTRICT JUDGE